**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


**WALTER BOWERS**,

        Plaintiff,

   **v.**

**MICHAEL ASTRUE**,
Commissioner of Social Security,

        Defendant.

**07cv533**

**ELECTRONICALLY FILED**


**MEMORANDUM OPINION**

**March 06, 2008**

## I. Introduction

Plaintiff, Walter Bowers, brings this action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) of the Social Security Act, seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Consistent with the customary practice in the Western District of Pennsylvania, the parties have submitted cross motions for summary judgment on the record developed at the administrative proceedings. After careful consideration of the Administrative Law Judge's ("ALJ") Decision, the memoranda of the parties, and the entire record, the Court will grant the Commissioner's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## II. Procedural History

On March 29, 2004, Plaintiff applied for DIB and SSI, alleging disability beginning

January 10, 2004, due to severe depression and pain and stiffness in his knees and shoulders. After his initial claim was denied, Plaintiff timely requested a hearing. The hearing was held before ALJ Boras Sacks on January 24, 2006, at which Plaintiff, unrepresented, testified along with a vocational expert (VE). On March 28, 2006, the ALJ denied Plaintiff's claim, finding that Plaintiff is not disabled and is able to do medium exertional work. The ALJ also found that Plaintiff could perform work that would provide him with a sit/stand option, that would be limited to simple work with one or two steps, and that would not require decision-making, changes in the work environment, travel to unfamiliar places or, interaction with supervisors or co-workers. After the denial, Plaintiff obtained counsel and requested a review of the ALJ's decision on May 4, 2006. The Appeals Council confirmed the ALJ's decision on February 16, 2007, thus becoming the final decision of the Commissioner. Plaintiff then filed his complaint herein seeking judicial review of the Commissioner's decision.

### III.    Statement of the Case

The ALJ found that although Plaintiff suffers from a depressive disorder, his depression is not severe enough (as mandated in Listing 12.04, 20 C.F.R. Regulations No. 4 Subpt. P, App. 1) to establish functional limitations. Tr. 20.[1] There is no evidence of Plaintiff suffering from a mental impairment that has lasted for two or more years or that has persisted despite medication or psychosocial support. *Id.* The ALJ discussed portions of Plaintiff's testimony where he stated the reasons for and symptoms of his depression (the death of his sister on his birthday and auditory hallucinations, respectively), the extent of his drug dependence (Plaintiff used "crack" cocaine), and his physical ailments (he suffers from stiffness in his shoulders and pain in his

[1]Tr. refers to the administrative transcript.

knees).  *Id.*  The ALJ discounted Plaintiff's testimony to the extent of his impairments based on the lack of objective medical evidence showing any lasting impairments.  Although Plaintiff testified to the severity of his impairments, the record did not show any documentation of regular ongoing treatment.  Tr. 21.  Furthermore, the ALJ evaluated the medical records pertaining to Plaintiff's pain in his knees and shoulders and his rehabilitation from drugs and found that there was no "significant objective findings" with regards to Plaintiff's joint complaints and Plaintiff's depression would improve with treatment.  Tr. 21.

The ALJ made the following specific findings:

1.      The claimant was born on March 9, 1951 and was considered a person "closely approaching advanced age" under the Medical-Vocational Guidelines until March 9, 2006, when he turned 55, and became a person of "advanced age."

2.      The claimant meets the non-disability requirements for a period of disability and disability insurance benefits as set forth in § 216(I) of the Social Security Act through December 31, 2008.

3.      The claimant has at least a high school education and is able to communicate in English.

4.      The claimant has not engaged in substantial gainful activity since January 10, 2004.

5.      The claimant has severe depression and a history of substance dependence.

6.      The claimant's depression does not impose functional limitations of the severity needed to establish a condition listed in Section 12.04, pertaining to affective disorders.

7.      As to the claimant's residual functional capacity, he is able to perform medium exertional work that would give him a sit/stand option.  The claimant is not required to do jobs requiring him to raise his arms over the shoulder.  He is able to work in jobs providing a standing/walking option and sitting option of not more than six hours in an eight-hour work day.  The claimant also needs to work in settings with simple job instructions, with one or two steps present, and routine repetitive tasks.  The claimant is not required to have close proximity or contact

with his co-workers and supervisors and no interaction with the general public. The claimant is not able to perform in jobs that require decision-making, intensive supervision, changes in the work setting, and travel to unfamiliar places.

8. The claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms but his statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

9. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpt. P, Appendix 1, Regulations No. 4.

10. The claimant left his job as a school custodian and entered rehabilitation due to a drug problem.

11. The claimant is unable to perform any past relevant work.

12. The claimant performed only unskilled work according to the vocational expert.

13. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform.

14. The claimant has not been under a "disability," as defined in the Social Security Act, from January 10, 2004, through the date of the ALJ's decision.

Tr. 17 – 23.

## IV. Standards of Review

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g) and 1383(c)(3). Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding Disability Insurance Benefits, or "DIB"), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are

pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a).  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002).

Substantial Evidence

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS*, 722 F.2d 1150, 1152 (3d Cir. 1983).  The district court's function is to determine whether the record, as a whole, contains substantial evidence to support the Commissioner's findings.  See *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla" of evidence, but rather, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (citation omitted).  See *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005); *Ventura*, 55 F.3d at 901 (quoting *Richardson*); *Stunkard v. Secretary of HHS*, 841 F.2d 57, 59 (3d Cir. 1988).

The Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), quoting *Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995).  "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993), quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).  The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner.  See *Stewart*

*v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983).

In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact finder. *Rutherford*, 399 F.3d at 552. In making this determination, the district court considers and reviews only those findings upon which the ALJ based his or her decision, and cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" *Id.* at 87; parallel and other citations omitted).

<u>Five Step Determination Process</u>

To qualify for DIB under Title II of the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). Similarly, to qualify for SSI, the claimant must show "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1383c(a)(3)(A).

When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the Commissioner utilizes the familiar five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). See *Sullivan*, 493 U.S. at 525. The Court of Appeals for the Third Circuit summarized this five-step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999):

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. . . . In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. . . .

If the claimant is unable to resume her former occupation, the evaluation moves to the final step [five]. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step. . . . *Plummer*, 186 F.3d at 428 (certain citations omitted). See also *Rutherford*, 399 F.3d at 551 ("In the first four steps the burden is on the claimant to show that she (1) is not currently engaged in gainful employment because she (2) is suffering from a severe impairment (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)).

If the claimant satisfies step 3, she is considered per se disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist

in significant numbers in the national economy that the claimant could perform (Reg. § 920(f)).

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to qualify for benefits in one of two ways:

(1) by introducing medical evidence that the claimant is disabled per se because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, or that the impairment is equivalent to a Listed Impairment. See *Heckler v. Campbell*, 461 U.S. 458, 460 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777 (Steps 1-3); or,

(2) in the event that claimant suffers from a less severe impairment, he or she will be deemed disabled where he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)). In order to prove disability under this second method, plaintiff must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4). *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that he or she is unable to resume his or her previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Campbell*, 461 U.S. at 461; *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003); *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777.

<u>Medical Opinion of Treating Sources</u>

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.' *Plummer*, 186 F.3d at 429 (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)) . . . ." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). The ALJ must weigh conflicting medical evidence and can choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." *Id.* at 317, quoting *Plummer*, 186 F.3d at 429 (additional citations omitted). The ALJ must consider all medical findings that support a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory, medical evidence, not on the ALJ's own credibility judgments, speculation or lay opinion. *Morales*, 225 F.3d at 317-318 (citations omitted).

Moreover, the Commissioner/ALJ must "explicitly" weigh all relevant, probative and available evidence. . . . [and] must provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. . . . The [Commissioner] may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects. *Adorno*, 40 F.3d at 48 (emphasis added; citations omitted). See also *Fargnoli*, 247 F.3d at 42-43 (although ALJ may weigh conflicting medical and other evidence, he must give some indication of the evidence he rejects and explain the reasons for discounting the evidence; where ALJ failed to mention significant contradictory evidence or findings, Court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving Court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . ."); *Burnett*, 220 F.3d at 121 ("In making a residual

functional capacity determination, the ALJ must consider all evidence before him. . . .  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

The rules and regulations of the Commissioner and the SSA make a distinction between (I) medical opinions about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and physical or mental restrictions, on the one hand, and (ii) medical opinions on matters reserved for the Commissioner, such as "disabled" or "unable to work," on the other. The latter type of medical opinions are on matters which require dispositive administrative findings that would direct a determination or decision of disability. Compare 20 C.F.R. §404.1527(a-d) (2002) (consideration and weighing of medical opinions) with 20 C.F.R. §404.1527(e) (2002) (distinguishing medical opinions on matters reserved for the Commissioner).

The regulations state that the SSA will "always consider medical opinions in your case record," and states the circumstances in which an opinion of a treating source is entitled to "controlling weight." 20 C.F.R. §404.1527(b), (d) (2002).  Medical opinions on matters reserved for the Commissioner are not entitled to "any special significance," although they always must be considered. 20 C.F.R. §404.1527(e)(1-2) (2002). The Commissioner's Social Security Ruling ("SSR") 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Policy Interpretation Ruling, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," explain in some detail

the distinction between medical opinions entitled to controlling weight and those reserved to the Commissioner.

SSR 96-2p explains that a "finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-29, Purpose No. 7. Where a medical opinion is not entitled to controlling weight or special significance because it is on an issue reserved for the Commissioner, these Social Security Rulings require that, because an adjudicator is required to evaluate all evidence in the record that may bear on the determination or decision of disability, "adjudicators must always carefully consider medical source opinions about any issue, including opinions about those issues that are reserved to the Commissioner," and that such opinions "must never be ignored. . . ." SSR 96-5p, Policy Interpretation, (emphasis added). Moreover, because the treating source's opinion and other evidence is "important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Id.*

A medical opinion also is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2). Where an opinion by a medical source is not entitled to controlling weight, the following factors are to be considered: the examining relationship, the treatment relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory

signs, consistency, specialization and other miscellaneous factors.  20 C.F.R. § 404.1527 (d)(1-6).

<u>Vocational Expert - Hypothetical Questions</u>

The determination of whether a claimant retains the RFC to perform jobs existing in the workforce at step 5 is frequently based in large measure on testimony provided by the vocational expert.  *Rutherford*, 399 F.3d at 553, citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (citations omitted).  Where a hypothetical question to the VE accurately sets forth all of a claimant's significant impairments and restrictions in activities, physical and mental, as found by the ALJ or as uncontradicted on the medical record, the expert's response as to the existence of jobs in the national economy which the claimant is capable of performing may be considered substantial evidence in support of the ALJ's findings on claimant's RFC. See, e.g., *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002), citing *Podedworny*, 745 F.2d at 218 and *Chrupcala v. Heckler*, 829 F.2d, 1276 (3d Cir. 1987) (leading cases on the use of hypothetical questions to VEs).  See also *Plummer*, 186 F.3d at 428 (factors to be considered in formulating hypothetical questions include medical impairments, age, education, work experience and RFC); *Boone*, 353 F.3d at 205-06 ("At the fifth step of the evaluation process, 'the ALJ often seeks advisory testimony from a vocational expert.'")  Objections to the adequacy of an ALJ's hypothetical questions to a vocational expert "often boil down to attacks on the RFC assessment itself." *Rutherford*, 399 F.3d at 554 n.8.

Additionally, the ALJ will often consult the Dictionary of Occupational Titles ("DOT"), a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy, in order to determine

whether any jobs exist that a claimant can perform." *Burns v. Barnhart*, 312 F.3d 113, 119 (3d

Cir. 2002); see also *Id.* at 126 (The "Social Security Administration has taken administrative

notice of the reliability of the job information contained in the [DOT].") (citing 20 C.F.R. §

416.966(d) (2002)).  While an unexplained conflict between a VE's testimony and the relevant

DOT job descriptions does not necessarily require reversal or remand of an ALJ's determination,

the Court of Appeals for the Third Circuit requires the ALJ to address and resolve any material

inconsistencies or conflicts between the DOT descriptions and the VE's testimony, and failure to

do so will necessitate a remand.  *Boone*, 353 F.3d at 206.

Multiple Impairments

Where a claimant has multiple impairments which, individually, may not reach the level

of severity necessary to qualify as a Listed Impairment, the ALJ/ Commissioner nevertheless

must consider all of the claimant's impairments in combination to determine whether,

collectively, they meet or equal the severity of a Listed Impairment.  *Burnett*, 220 F.3d at 122

("the ALJ must consider the combined effect of multiple impairments, regardless of their

severity"); *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's

eligibility for benefits, the 'Secretary shall consider the combined effect of all of the individual's

impairments without regard to whether any such impairment, if considered separately, would be

of such severity,'") citing 42 U.S.C. § 423(d)(2)(c), and 20 C.F.R. § § 404.1523, 416.923).

Section 404.1523 of the regulations, 20 C.F.R. § 404.1523, Multiple impairments,

provides:

In determining whether your physical or mental impairment or impairments are of a

sufficient medical severity that such impairment or impairments could be the basis of eligibility

under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

Even if a claimant's impairment does not meet the criteria specified in the listings, he must be found disabled if his condition is equivalent to a listed impairment. 20 C.F.R. § 404.1520(d). When a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the Secretary denies the payment of disability benefits." *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir.1971) . . . ."). To that end, the ALJ may not just make conclusory statements that the impairments do not equal a listed impairment in combination or alone, but rather, is required to set forth the reasons for his or her decision, and specifically explain why he or she found a claimant's impairments did not, alone or in combination, equal in severity one of the listed impairments. *Fargnoli* , 247 F.3d at 40 n. 4, citing *Burnett*, 220 F.3d at 119-20.

If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether claimant is unable to return to past employment or perform substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [he/she] believed was needed to make a sound determination." *Ferguson*, 765 F.2d 36.

<u>Claimant's Subjective Complaints of Impairments and Pain</u>

An ALJ must do more than simply state factual conclusions, but instead must make

specific findings of fact to support his or her ultimate findings. *Stewart*, 714 F.2d at 290. The

ALJ must consider all medical evidence in the record and provide adequate explanations for

disregarding or rejecting evidence, especially when testimony of the claimant's treating physician

is rejected. See *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir.1984); *Cotter v.*

*Harris*, 642 F.2d 700, 705 (3d Cir.1981). He or she must also give serious consideration to the

claimant's subjective complaints, even when those assertions are not confirmed fully by

objective medical evidence. See *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993);

*Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986).

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant

from performing any substantial gainful work. E.g., *Carter v. Railroad Retirement Board*, 834

F.2d 62, 65, relying on *Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v.*

*Califano*, 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir.

1979). Similarly, an ALJ must give great weight to a claimant's subjective description of

inability to perform even light or sedentary work when this testimony is supported by competent

evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999),

relying on *Dobrowolsky*. Where a medical impairment that could reasonably cause the alleged

symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom,

and the extent to which it affects the individual's ability to work. This obviously requires the

ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the

extent to which he or she is disabled by it. See 20 C.F.R. § 404.1529(c). *Hartranft v. Apfel*, 181

F.3d 358, 362 (3d Cir. 1999).

But, if an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. See *Cotter*, 642 F.2d at 705. Our Court of Appeals has stated: "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433.

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight. *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195. That is, while "there must be objective medical evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green*, 749 F.2d at 1070-71 (emphasis added), quoted in *Mason*, 994 F.2d at 1067. Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount claimant's pain without contrary medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987); *Akers v. Callahan*, 997 F.Supp. 648, 658 (W.D.Pa. 1998). "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence. Instead, the Secretary must present evidence to refute the claim. See *Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence)." *Williams v. Sullivan*, 970 F.3d

1178, 1184-85 (3d Cir. 1992) (emphasis added), cert. denied 507 U.S. 924 (1993).

In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. Burnett v. Commissioner of Social Security, 220 F.3d 112, 119-20 (3d Cir. 2000). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician; "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports . . . ." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

### State Agency Medical and Psychological Consultants

Medical and psychological consultants of a state agency who evaluate a claimant based upon a review of the medical record "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 404.1527 (f)(2)(I). See also SSR 96-6p: Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants ("1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of non-examining sources at the administrative law judge and Appeals Council levels of administrative review. 2.

Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.")

IV.     **Discussion**

Plaintiff presents one major argument for the reversal of the ALJ's decision.  He argues that the ALJ did not exercise a "heightened duty of care" to Plaintiff (who was unrepresented at his administrative hearing) and the failure to do so was unfair and prejudiced him during the hearing.  Plaintiff develops his argument in three parts; specifically, he asserts that (1) the ALJ "ignored plaintiff's clear request for representation," (2) "did not complete the medical evidence record or explain to Plaintiff his responsibility and the implications of not doing so" and (3) did not provide Plaintiff with a full understanding of the role of the VE.  Plaintiff's Brief, pp. 8-15.

A.     <u>The ALJ did not ignore Plaintiff's request for representation</u>.

An ALJ "owes a duty to a *pro se* claimant to help him or her develop the administrative record.  'When a claimant appears at a hearing without counsel, the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'"  *Reefer v. Barnhard*,  326 F.3d 376, 380 (3d Cir. 2003) (citations omitted), quoting, *inter alia*, *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985); see also *Dobrowolsky*, 606 F.2d at 407 (ALJ must "assume a more active role when the claimant is unrepresented").  However, a remand is not warranted simply because the plaintiff is not represented at the hearing.  *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); *Dobrowolsky*, 606 F. 2d at 407); *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837, 840 n. 4 (3d Cir. 1974).  "[I]f it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness

due to lack of counsel, this is sufficient for remand . . . ." *Livingston*, 614 F.2d at 345.

In this instant matter, Plaintiff cites to several portions of the transcript as support for the first part of his argument that the ALJ ignored his request for representation. He argues that the record does not support the ALJ's contention that he had waived his right to representation. Plaintiff's Brief, at p. 10. The following is the full iteration of the relevant portion of the hearing transcript:

| | |
|---|---|
| ALJ: | Now, number two, you are not represented by any attorney or non-attorney Social Security representative? |
| CLMT: | No. |
| ALJ: | When you received the mail about this hearing today, which includes a literature abut a representative, do you remember receiving this? |
| CLMT: | Yeah. |
| ALJ: | Okay, so then you've read that literature? |
| CLMT: | Yeah. |
| ALJ: | Do you wanna go forward today with a representative or do you wanna get a rep? You tell me what you wanna do. |
| CLMT: | I can't afford no attorney. |
| ALJ: | Pardon me? |
| CLMT: | I can't afford no attorney. |
| ALJ: | Well, here's the thing and it was spelled out in the materials that we've given you. If we make you an award, I'm saying if you get an award, I find in your favor, that's not a guarantee I am cause we haven't taken testimony, but if I do make an award in your favor, an attorney can only get a certain percentage of, you know, from the day we start up to the day's date. He can get nothing from today forward. So [INAUDIBLE] and would be paid for this representative from the funds that we give you, you don't have to pay anything for it. So it would come out of your funds from Social Security, you don't have to put any money out of pocket, and it's only for past due monies you would get, nothing in the future. So that's up to you. That was all set forth and explained in the letter we sent you as well. Do you still wanna go ahead? |
| CLMT: | Yeah, I think so. |

| | |
|---|---|
| ALJ: | Sure. |
| CLMT: | I tried to get - - |
| ALJ: | Speak up a little louder. |
| CLMT: | I tried to get Berger and Green - - |
| ALJ: | Yes. |
| CLMT: | - - and, but they wouldn't take my case, so I guess the figured they couldn't win it since I, I don't know, they called me and well, they had called and I got in contact with em and I explained everything to em, they asked me questions, then they seem like, and I told em and then wouldn't take my case. |
| ALJ: | Okay. I mean I don't think I should get involved with who you had called or you didn't call by name. You tell me you called an attorney or rep – |
| CLMT: | Okay. |
| ALJ: | - - and they wouldn't handle your case. But now, you tell me this, do you wanna get a representative or do you wanna go forward today and get this thing done and over with? |
| CLMT: | I would just go forward and get it done. |
| ALJ: | Okay. |
| CLMT: | If it, sir, can I as you a question? |
| ALJ: | Yes. |
| CLMT: | If it don't come out right can I still go get attorney Masters – |
| ALJ: | No. |
| CLMT: | - - after the hearing is all over with? |
| ALJ: | You have a choice – |
| CLMT: | I can't? |
| ALJ: | - - to get an attorney to represent you today. If it comes out and I find against you, you can't, I mean you don't have the grounds to say you want another hearing, this time with a representative. All you can do is appeal the case to a high authority. You can get a representative at that time. |
| CLMT: | Okay. |
| ALJ: | But you cannot use the fact that you didn't have a rep today - - |
| CLMT: | Okay, okay. |
| ALJ: | - - as a reason for an appeal. |
| CLMT: | Okay. |
| ALJ: | Now you tell me what you wanna do. |
| CLMT: | I want a attorney, but I don't know how to go about getting one. |
| ALJ: | Well we gave you that list of about maybe 15 or 20 places. Did you call anybody on there? |
| CLMT: | I just called Berger and Green. |
| ALJ: | Okay, then you didn't call any of those other places? |

CLMT:      No, I just called Berger and Green.

. . .

ALJ:       Okay.  So if you wanna go ahead now, you made that choice.
           This is a form that I want you to sign.  All this does is ay I
           explained to you your rights to get an attorney, and I put that
           right in the file.
Tr. 152-156.

The Court disagrees with Plaintiff that the ALJ ignored Plaintiff's 'clear request' to obtain representation.  Plaintiff was very much aware of his right to representation.  As evident in the relevant portion of the hearing, Plaintiff testified that he had obtained and read the documentation regarding his right to representation.  Plaintiff also states that his reason for not getting a representative was because he could not afford one.  On that note, the ALJ informed Plaintiff that he would not have to pay for an attorney but that the fees would be a percentage of the award that Plaintiff received (provided the ALJ ruled to award Plaintiff benefits).  Plaintiff also indicated that he attempted to contact only one group on the list, Berger and Green, to represent him and they wouldn't take his case.  He did not attempt to contact the other groups on the list.

The ALJ then asked Plaintiff if he wanted to continue without representation and Plaintiff answered in the affirmative.  The ALJ also informed Plaintiff that if he were unsuccessful with this hearing, he would not be able to request another hearing with representation.  His option then would be to seek review of the ALJ's decision and that is exactly what Plaintiff did.  Plaintiff obtained counsel within a month of the ALJ's decision and counsel, on his behalf, sent a request to the Appeals Council asking for review of the ALJ's decision against Plaintiff.

Additionally, the record shows that the state agency and the ALJ informed Plaintiff of his

right to representation on several occasions. Subsequent to the initial denial of Plaintiff's claim, on July 2, 2004, the state agency informed Plaintiff of his right to have a representative appeal on his behalf, be it "a friend, lawyer, or someone else." Tr. 34. The state agency also informed him in the same letter of the list of groups that could help Plaintiff (this list is present in all local Social Security offices) and of attorneys who do not charge a fee unless Plaintiff is awarded benefits. *Id.* Again on October 4, 2004, the state agency sent Plaintiff information on the hearing process and reminded him of his right to representation and the list of groups present in the local Social Security office. Tr. 38. The state agency also enclosed a leaflet entitled 'Social Security and Your Right to Representation' which contains information on what Plaintiff can do and what his options provide him . Tr. 38 and 54. The state agency also advised Plaintiff of his right to representation in a letter sent on December 18, 2005 informing Plaintiff of his hearing that was scheduled for January 24, 2006. Tr. 24-27. Thus, substantial evidence from the record establishes that the letters and the information provided to Plaintiff during his hearing served as adequate notice of his right to representation, the means with which he could obtain representation, and the implications of not being represented.

Plaintiff also argues that his confusion about the process of obtaining representation was evident to the ALJ, that the ALJ failed to follow the procedure as mandated in the Hearings, Appeals and Litigation Law Manual (HALLEX), Section I-1-103 ("Section I-1-103," Notifying Claimants Who Are Not Represented by an Attorney of the Options for Obtaining Representation), and that the ALJ should have ended the hearing when Plaintiff expressed his need of an attorney. Plaintiff's Brief, pp. 10-11. The Court agrees with Plaintiff that the ALJ was aware of Plaintiff's confusion about getting representation. However, the ALJ took steps to

elicit the reason for the confusion and to clarify those points of confusion for Plaintiff. He

discussed with Plaintiff at length the process and his options. See *Brittingham*, 408 F.Supp. at

610 ("[T]he better practice would be for the Administrative Law Judge to briefly but specifically

outline to the claimant the sources of potentially available free or other legal representation . . .

[and] explain the functions that an attorney could be expected to perform"). As discussed above,

the ALJ told Plaintiff that he could obtain representation by calling the groups listed in the leaflet

the state agency sent him. Plaintiff also indicated that he had read the list and other sent

materials and in fact had called one of the groups. Furthermore, the ALJ did follow the protocol

dictated by Section I-1-103. Section I-1-103 of the Hearing Office Manual states:

> SSA field office (FO) staffs inform unrepresented claimants of the right, if they
> choose, to be represented. On request, FOs also provide more detailed
> information to claimants about representation, including lists of organizations
> which provide legal services free of charge to qualifying claimants. For this
> purpose, each FO maintains a list of lawyer referral services and legal service
> organizations which do not charge a fee for providing services. In addition,
> each FO periodically updates the address information on its list and sends a
> copy of the updated list to the hearing office (HO) which services the FO's
> service area.
>
> The HO has available and distributes one or more lists of lawyer referral
> services and legal service organizations based on the lists provided by the FOs
> serviced by the HO. If the HO staff becomes aware that the information on a
> referral list (names, addresses, etc.) is inaccurate or out-of-date, the HO staff
> will update its copy of the list and send a copy of the corrected list to the
> appropriate FO so they may also update their list.
>
> If an unrepresented claimant requests a hearing before an ALJ, the HO staff
> will send a representative referral list to the claimant with the acknowledgment
> letter.

HALLEX, Section I-1-103, Updated May 19, 2005.

As established earlier, Plaintiff was sent information about his right to representation on

several occasions, he received a list of groups that help with obtaining representation, and he was informed that he did not have to pay for an attorney.

      B.      <u>The ALJ did complete the medical evidence of record and advised Plaintiff of the significance of obtaining his medical evidence</u>.

In the second part of his argument, Plaintiff contends that the ALJ failed to complete the medical evidence of record or explain the consequences of not doing so. Secondary to his 'failure to develop the record' argument, Plaintiff also asserts that the ALJ did not explain to him the significance of obtaining his medical evidence and that the ALJ failed to investigate the information provided by Plaintiff during his testimony at the hearing.

In making his determination to deny Plaintiff the award of benefits, the ALJ relied on the record which contained reports issued by Dr. Linda Rockey, a psychologist, Dr. Wendy Helkowski, a physician, Cove Forge Behavioral Health System ("Cove Forge"), Western Psychiatric Institute and Clinic ("WPIC"), Drs. Roger Glover and Michael Nimiec who reviewed Plaintiff's records at the behest of the state agency, and the testimony of Dr. Fred Monaco, the vocational expert.

Plaintiff was admitted to WPIC on January 30, 2004 with complaints of hearing voices. Tr. 94. He was prescribed a regimen that included medications (Lexapro 10 mg, Thiamine 100 mg, Folic acid 1 mg, a multi-vitamin, and Vistaril 25 mg) and individual and group therapy, both of which contributed to Plaintiff moderately improving his condition. Tr. 95. Plaintiff was reported as being cooperative, attending and actively participating in two to four groups daily, talking with his brother and sister after two to three months of silence, and looking forward to going to rehabilitation upon completion of his time at WPIC. Tr. 96. Plaintiff also expressed

continuation with the WPIC program as an outpatient.  *Id.*  By the conclusion of his inpatient tenure with WPIC, Plaintiff no longer experienced visual or auditory hallucinations and had stopped expressing paranoid and delusional ideation.  *Id.*  His orientation (in terms of people, places, and time), memory, attention, and concentration appeared intact.  *Id.*  WPIC recommended further treatment including pharmacotherapy, group and individual therapy, and rehabilitation at Cove Forge.  Tr. 99.

Plaintiff started his outpatient treatment at Cove Forge on March 02, 2004.  Tr. 101.  He was diagnosed with alcohol and cocaine dependence, major depressive disorder, psychotic disorder, and degenerative joint disease.  *Id.*  He was also referred to Dr. Linda Rockey in May 2004, from the Bureau of Disability Determination for Clinical and Psychological Evaluation, to ascertain the extent of his alcohol and drug dependence.  Tr. 104.  Although Plaintiff had testified that he stopped using drugs after rehabilitation, Dr. Rockey's report shows that Plaintiff was still addicted to drugs, at least, up until the point he met her in May 2004.  Tr. 22 and 104.

Dr. Rockey reported Plaintiff as starting the use of "crack" cocaine at the age of 45 and had first attended an outpatient partial-hospitalization program at Greenbrier in 2001 for drug and alcohol rehabilitation.  Tr. 105.  Plaintiff had also used Vioxx for the pain in his knees.  She diagnosed him as having recurrent major depressive disorder with severe auditory hallucinations and arthritis in both knees and his right shoulder causing him significant pain.  Tr. 107.  The stress caused by the addiction, concern about returning to work, and fear of the future contributed to Plaintiff's condition.

Dr. Rockey gave Plaintiff the number for the Outpatient Division of WPIC to receive psychiatric and psychological treatment and to see if the Lexapro was helping him manage his

depression. Although Plaintiff agreed with Dr. Rockey's recommendation and indicated that he would follow-up in making an appointment, there is no record of him doing so. Dr. Rockey completed the "Medical Source Statement of Ability to do Work-Related Activities (Mental)" form and recorded the following: Plaintiff had slight limitations with regards to understanding and remembering short/simple instructions and carrying out short/simple instructions; Plaintiff had moderate limitations with carrying out detailed instructions, making judgments on simple work-related decisions, interacting appropriately with the public, supervisors, and co-workers, and responding appropriately to work pressures and changes in a usual work setting. Tr. 111-114.

As part of another referral from the Bureau of Disability Determination, Plaintiff met with Dr. Wendy Helkowski on June 28, 2004 for a consultation evaluation. Dr. Helkowski also requested an x-ray of Plaintiff's knees and shoulder which did not show any effusions. Plaintiff's medial lateral, and patellofemoral joints were recorded as normal. Tr. 133, 136. Dr. Helkowski also reported Plaintiff as "currently us[ing] alcohol and crack" in June 2004. Tr. 135. Musculoskeletal examinations of Plaintiff's knees showed "no laxity, no crepitus, and no instability." Tr. 136. His left metacarpal joint examination showed a "full range of motion, no swelling or erythema [although there was] . . . mild tenderness . . . over the joint." *Id.* Dr. Helkowski's final observations were "[m]ultiple joint complaints without significant objective findings." Tr. 137.

Dr. Helkowski also noted Plaintiff had no limitations in terms of lifting, carrying, standing, walking, sitting, pushing, pulling, postural activities or other environmental factors (such as poor ventilation, dust, heights, fumes, etc. . .) Tr. 139. However the "Physical Residual

Functional Capacity Assessment" form that was completed about a month later on July 19, 2004 by Dr. Nimiec, reported several limitations for Plaintiff. He is able to occasionally lift 100 pounds or more, 50 pounds frequently, stand/walk for about six hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and push/pull for an unlimited amount of time. Tr. 133-145.

Plaintiff's testimony concerned other avenues that he had pursued for his physical infirmities that were not evidenced in the record. The following is Plaintiff's testimony regarding the alternate avenues:

| | |
|---|---|
| ALJ: | How often do you take Lexapro? |
| CLMT: | Once a day. |
| ALJ: | Did it help you? |
| CLMT: | Sometimes. |
| ALJ: | Do you still go back to get any kind of mental health treatment? |
| CLMT: | No, I - - |
| ALJ: | At one time you show a Dr. Wendy Elkowsky (phonetic)? |
| CLMT: | Yes. |
| ALJ: | Do you remember her? |
| CLMT: | Yes. |
| ALJ: | You ever see her anymore? |
| CLMT: | No, I seen Dr. Goldberg one time, but I don't have no health insurance no more, so - - |
| ALJ: | Oh okay. |
| CLMT: | I have, and Dr. [INAUDIBLE] Bloomberg, he's an arthritis person, he wants $135.00 a visit. |
| . . . | |
| ALJ: | Yeah, I read some of the things about, that you complained about both knees and your right shoulder, you have stiffness. |
| CLMT: | Yeah. |
| ALJ: | And that was in Dr. Elkowsky's report. She couldn't find what was causing the stiffness. |
| CLMT: | I tried to tell her, I say, Doc, do a x-ray, and she wouldn't give me no x-ray and I had, I had medical insurance at that time, I said Doc, I can pay for it, give me a x-ray, and she would do it. She just told me that, she just gave me a hand job. |

. . .

| | |
|---|---|
| CLMT: | My back, I went to the hospital, and they said I got DJD in my back. |
| ALJ: | What hospital was that? |
| CLMT: | Shadyside. |
| ALJ: | When did you go there? |
| CLMT: | I went there, went there, was it, what's this month, January? |
| ALJ: | Yeah, this is January. |
| CLMT: | January, I went there last year some time and they gave me x-ray, they said that's what I had. |
| ALJ: | Oh, they gave you an x-ray. |
| CLMT: | Right. |
| ALJ: | Did you still have your insurance? |
| CLMT: | Yes. They said I had DJD, and I'm trying to get the records. I went over there to my records and they kept sending me to this place, I had trouble trying to find it. |
| ALJ: | You had trouble finding what? |
| CLMT: | The place they sent me to get the records, I tried to get my records from Shadyside Hospital, it's on Center Avenue. |
| ALJ: | It's on Center Avenue. |
| CLMT: | Yeah. And that's when I went to see Dr. Goldblume and he said that there was nothing that he could do for my back cause he said something bout the bones in my back was deteriorating, but he said there was nothing that he could do, give me some exercises to do. |
| ALJ: | Did you do the exercises? |
| CLMT: | He said, I asked him about that, he asked me did I walk a lot and I said, he asked me did I walk and I told him yeah. |

Tr. 163-171.

Plaintiff's argument that he did not understand the significance of obtaining medical evidence and that the ALJ failed to investigate the information from his testimony during the hearing lacks merit. In the letter sent to Plaintiff on October 4, 2004, the state agency informed Plaintiff that if he needed help in obtaining evidence, he could go to the local Social Security office for help and he could also ask the ALJ to "issue a subpoena that requires a person to submit documents or testify at [his] hearing." Tr. 38. Additionally, in the letter dated December

18, 2005, the ALJ again informed Plaintiff about the protocol for submitting evidence and of his right to request a subpoena in order to obtain documents or to require people to testify at his hearing. Plaintiff testified about trying to obtain his medical records from Shadyside Hospital but he could not find the facility that he had been told the records were being kept. Plaintiff might not have had the wherewithal to acquire the evidence but he knew that he had to do so.

The Court also notes that there were inconsistencies in Plaintiff's testimony and that the ALJ had found Plaintiff's statements about his impairments to not be entirely credible. Plaintiff had testified that he asked Dr. Helkowski for an x-ray and she refused him even though the record does show that she did request the x-ray of Plaintiff's joints and those showed no effusions. Tr. 133, 136, 168. Plaintiff had stated that he stopped using drugs after he had completed his rehabilitation but Dr. Helkowski noted that Plaintiff was using drugs and alcohol after his rehabilitation. Tr. 22, 135. He had also testified about going to see Drs. Goldberg, Goldblume, Bloomberg, and Shadyside Hospital for his physical infirmities. As the transcript excerpt illustrates, Plaintiff's testimony about his visitations are very unclear and conflicting. There is confusion about the identity of Dr. Goldberg (whether his name is actually Dr. Goldblume or whether they are two separate doctors) and of his role in Plaintiff's care (the same can also be said of Dr. Bloomberg and Shadyside Hospital) and Plaintiff made no attempts to clarify that issue.[2]

---

[2] The Court notes discrepancies in Plaintiff's referral to Drs. Goldberg and Goldblume. In his Brief in Support of Summary Judgment, Plaintiff seems to indicate that Drs. Goldberg and Goldblume are the same person and that Plaintiff was merely confused about the individual's name. Document No. 8, pp. 12-13 (there is no mention of Dr. Goldblume, rather Plaintiff seems to indicate that the ALJ did not consider the treatment Plaintiff received from only Drs. Goldberg and Bloomberg and Shadyside Hospital). However, in Plaintiff's Response to Defendant's Brief in Support for Summary Judgment (Document No. 11, pp. 2-3), Plaintiff refers to Drs. Goldberg

C.    The ALJ did provide Plaintiff with a comprehensive description of the Vocational Expert's role and functions.

Lastly, Plaintiff argues that his "lack of understanding regarding the role of the Vocational Expert at the hearing clearly prejudiced him."  Document No. 8, p. 15.  He contends that he was not given the chance to ask the VE questions about work limitations.

The transcript supports an inference that Plaintiff may have not initially understood the issues that the VE discussed and his right to cross-examine the VE about his exertional and non-exertional limitations.  However, once again, the ALJ (as he had previously done with Plaintiff's confusion on obtaining representation) provided Plaintiff with a thorough explanation.  The ALJ asked the VE to explain his role.   The ALJ also posed a hypothetical question to the VE asking him to consider a claimant with Plaintiff's age, education and past work experience who was limited to medium work with a sit/stand option, could only stand, walk and sit for six hours in an eight hour day, could only perform jobs with simple instructions and one or two steps and could not interact with the general public, travel or make decisions.  Tr. 174.   The VE stated that such a claimant would be able to work as a hand packer (332,000 jobs in the national economy), as part of a bench assembly (308,000 jobs) and as an abrasive machine operator (119,000 jobs).  *Id*.

The ALJ provided Plaintiff with an opportunity to ask the VE questions to which Plaintiff queried if the VE would find him a job or if the VE's role was to find jobs.  The ALJ explained to Plaintiff that the VE describes the types of jobs that a person of Plaintiff's capabilities and background could perform and that Plaintiff could go to the state unemployment agency to obtain

and Goldblume as two different people (arguing that the ALJ considered the three doctors to be one person and failed to obtain medical records from four providers, Drs. Goldberg, Bloomberg, Goldblume, and Shadyside Hospital).

such jobs.  Tr. 174-175.

The Court finds that the ALJ's hypothetical question did incorporate of all plaintiff's impairments as they were supported by the record.  See *Chrupcala*, 829 F.2d at 1276, ( "[a] hypothetical question must *reflect all of a claimant's impairments that are supported by the record*; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence.") (citing *Podedworny v. Harris*, 745 F.2d 210 (3d Cir.1984) and *Wallace v. Secretary*, 722 F.2d 1150 (3d Cir.1983)) (emphasis added).  Furthermore, the ALJ directed the VE to provide an explanation of his role and the ALJ elaborated on that subject.  The ALJ also answered Plaintiff's questions and gave him an opportunity to ask questions.

The Court finds substantial evidence of record to support the ALJ's determination that plaintiff was not disabled and therefore did not qualify for SSI and DIB.

## V.      Conclusion

The Court has reviewed the ALJ's findings of fact and decision, and determines that his finding that Plaintiff was not disabled under the Social Security Act is supported by substantial evidence.  Accordingly, the Court will grant the Commissioner's Motion for Summary Judgment, deny Plaintiff's and enter judgment in favor of the Commissioner.


An appropriate order will follow.


    /s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc: All counsel of record listed on ECF